Homer DUNLAP, Hilmer Dunlap and Homer Dunlap, as Trustee of the Terry K. Dunlap and Stephen F. Dunlap Trust, d/b/a St. Clair Lime Company, a Partnership, Appellants,

v.

WARMACK–FITTS STEEL COMPANY, Inc., Appellee.

WARMACK–FITTS STEEL COMPANY, Inc., Appellant,

v.

Homer DUNLAP, Hilmer Dunlap and Homer Dunlap, as Trustee of the Terry K. Dunlap and Stephen F. Dunlap Trust, d/b/a St. Clair Lime Company, a Partnership, Appellees.

Nos. 18437, 18438.

United States Court of Appeals Eighth Circuit.

Jan. 11, 1967.

Opinion Amended and Rehearing Denied in No. 18437 Feb. 2, 1967.

J. Michael Shaw, of Shaw, Jones & Shaw, Fort Smith, Ark., for Homer Dunlap and others. Bruce H. Shaw, Fort Smith, Ark., was with him on the brief.

C. Randolph Warner, Jr., of Warner, Warner, Ragon & Smith, Fort Smith, Ark., for Warmack-Fitts Steel Co. Douglas O. Smith, Jr., Fort Smith, Ark., was with him on the brief.

Before MATTHES, MEHAFFY and LAY, Circuit Judges.

MATTHES, Circuit Judge.

Warmack-Fitts Steel Company, hereinafter referred to as contractor, is a general contractor specializing in erection of steel and construction of plants requiring steel construction work. Homer Dunlap and the other parties named in the caption as appellants will hereinafter be referred to as owners. They contemplated the erection of a 200 ton per day lime plant in Marble City, Oklahoma. Kennedy-Van Saun, hereinafter referred to as KVS, is a large manufacturer of machinery for the production of finished lime products. KVS designed the Marble City plant, supervised construction of the assembly work involved, and supplied the necessary KVS equipment to owners under separate contract.

The owners and contractor entered into a series of three written contracts for the erection of the plant. Contractor substantially completed the plant on June 26, 1964, over two months beyond the completion date of April 22, 1964 set forth in the third contract. A dispute arose as to the balance due under the written contracts and for labor and materials furnished by contractor which allegedly was not encompassed by the contracts. The contractor claimed that the

owners were indebted to it in the sum of $48,231.21. The owners by counterclaim prayed judgment against appellee for $55,000.00 as damages for unnecessary delay in completion of the project. After an extended trial, the court, Honorable John E. Miller, found that the contractor was entitled to recover the sum of $45,303.21, and interest at 6% from June 26, 1964. Judgment was entered for that amount and for dismissal of the counterclaim.

No. 18,438 is an appeal by contractor from that part of the judgment disallowing its claim for attorney fees.

The trial focused almost entirely on contractor's claim for extra work and materials and on owners' counterclaim. It became evident from the outset of the litigation that, by and large, the issues as framed by the pleadings presented questions of fact. In appeal No. 18,437 the owners contend in effect that the lower court's findings of fact are contrary to the overwhelming weight of the evidence, and are therefore clearly erroneous within the meaning of Rule 52(a), Fed.R. Civ.P.

■ As thus posited, the scope of our review is limited. We do not, of course, retry disputed factual matters or substitute our judgment for that of the trial court on fact questions. We only determine whether the court's findings of fact are clearly erroneous, that is, whether on the whole record it convincingly appears that a mistake has been made. United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

Some of the important background facts were not controverted. The first written contract, entered into on December 24, 1963, related to the construction of buildings, foundation work, and erection of the KVS equipment. The stated consideration was $128,700.00. The second contract, entered into on March 5, 1964, required the contractor to furnish equipment in the nature of materials handling conveyors for a consideration of $53,071.00. The third contract, entered into on March 17, 1964, covered additional items on various buildings and construction of a penthouse for a consideration of $14,919.00. The sum of $166,090.40 has been paid to contractor, leaving a balance due on the written contracts of $30,599.60. The parties stipulated as to certain undisputed extras due contractor and undisputed credits due owner, which admittedly left a balance due contractor in the amount of $26,924.00. Additional extras asserted by contractor raised the total amount claimed to $47,883.21. The owner, on the other hand, in addition to its counterclaim, asserted additional credits of $4,457.50, which would have reduced the total amount due contractor to $22,466.50.

■ At issue in the trial were a total of sixteen items relating to claimed credits and extras, most of which the court resolved in favor of contractor. Owners' main theme of appeal is that the trial court accepted contractor's position "solely on the bare and unsupported testimony" of Bill Fitts, an officer of contractor. The credibility of a witness, however, in a non-jury case, particularly where the testimony is conflicting, is a matter which is left to the sound discretion of the trial court, who alone can observe the demeanor of the witnesses and assess the probative value of the evidence offered. Cf. Mitchell v. Goodyear Tire and Rubber Company, 278 F.2d 562, 565 (8th Cir. 1960). Moreover, the fact that the testimony of an interested party is uncorroborated does not in and of itself preclude its acceptance by the trial court, but relates only to its probative value in light of all the other evidence in the case. See Lieberman v. Matson Navigation Company, 300 F.2d 661, 662 (9th Cir. 1962). Cf. Schoenberg v. Commissioner of Internal Revenue, 302 F.2d 416, 419 (8th Cir. 1962). Owners argue further, however, that their position is "supported not only by the testimony of the interested appellant, Dunlap, but also by the testimony of disinterested third parties and/or by documentary evidence." The owners do not deny that the contractor is entitled to be compensated for labor and materials not embraced in the specifications and draw-

ings which detailed the work involved and constituted a part of the written contracts.[1] Indeed, the case was tried on that theory and the owners concede as much here. The owners contend, however, that a number of the disputed items were not in fact extras, but were clearly encompassed either by the written contracts or by the reference drawings which were made a part of the contracts. We pass now to the specified items.

## CLAIMED EXTRAS

### I.

■ The original contract required the contractor to drill sixty-four holes four and one-half feet deep and to place therein re-enforcing steel and grouting material. This operation is referred to in the record as "foundation dowel placement." After the contract was signed but before work commenced, the owners decided that additional dowel holes would be required in connection with the construction of the foundation. The effect of this change was that 106 holes, approximately twelve feet deep with a total footage of about 1,252 feet, would have to be drilled, re-enforced and grouted, as compared to the original plans calling for sixty-four holes with a total footage of approximately 288 feet. The contractor contemplated drilling the sixty-four holes four and one-half feet deep with a jack hammer. In order to drill the holes the required depth of twelve feet or more a different drilling outfit was needed. The owners had such a drilling rig on the premises, which they used to drill the 106 holes at the greater depth. The question litigated in the trial court was whether the use of owners' drilling rig fully compensated contractor for the extra labor and grouting materials made necessary by the change in the contract. The trial court accepted contractor's version of the agreement in regard to the extras and allowed it $2,529.91.

In taking issue with the court's finding the owners insist that a letter of confirmation, dated January 27, 1964, sent to the contractor and which admittedly was received, is conclusive proof that their labor and drilling equipment was the agreed exchange for the dowels, grouting and labor furnished by contractor over and above that called for in the written contract. The confirmation letter standing alone certainly supports owners' position but there is other evidence. Bill Fitts testified positively and unequivocally that upon receipt of the letter he contacted Terry K. Dunlap, the writer of the letter, and rejected the offer as ridiculous. Thus the court was faced with conflicting evidence. It saw fit to resolve the conflict in favor of the contractor. We are not disposed to interfere with the court's finding. Aside from the economics of the transaction arising from the modification of the contract, which in our view supports the contractor's theory, the plain fact is that the trial court's finding is supported by substantial evidence and certainly is not clearly erroneous.

### II.

■ The contractor claimed and the court allowed $9,455.62 for extra labor and use of rigs in assembling parts of the KVS equipment which was installed in the lime plant. Owners contend that all of the items forming the basis for this extra charge were embraced in the original bid information, the contract plans and specifications, and that therefore the court's findings in regard to this charge are clearly erroneous. We agree and reverse this allowance.

The record shows and contractor concedes that prior to the time it submitted its bid it was furnished with data which included a number of drawings prepared by KVS relating to the assembling of the equipment. The bid forms and draw-

1. The contracts do not, as we read them, provide for the furnishing of extras. Contracts 1 and 3 provide respectively that "no substitutions or alterations shall be made * * * except with the writ- ten consent first obtained of Owner and the Engineer (contract No. 1)" and "except with the written consent of Owner first obtained (contract No. 3)."

ings which became a part of the contract referred to additional reference drawings. It is likewise without dispute that the reference drawings contained detailed information, that is, the drawings submitted with the bid forms, together with the reference drawings, clearly revealed what was required to be done in order to assemble and erect the KVS equipment. Included in the bid forms was this provision which played a key role in the trial court's decision:

"For detail information on drawings prior to bidding contact

Mr. Robert Shandry

Kennedy Van Saun Mfg. & Eng. Corp.

Danville, Penna."

Although Bill Fitts was fully aware of the existence of the reference drawings he did not avail himself of these documents. Instead, according to his testimony, he contacted Shandry "as to what effect these drawings would have, did they have enough effect on the steel erection for it to be necessary for him to send them to me and he said, no, in his idea it didn't because it was strictly for shop reference."

Relying solely on the information contained in the drawings actually submitted, and on the statement of Shandry, contractor submitted a bid of $17,500.00 for the assembly work.

The ensuing contract of December 24th provided:

"Where any conflicts occur between proposal and bid of Contractor and plans and/or specifications furnished by Owner or Engineer, said plans and/or specifications shall control.

&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;

"Engineer will furnish to the Contractor such additional drawings or explanations as may be necessary to detail and illustrate the work to be done, and the Contractor shall conform to the same as a part of this contract,

the same as if they were originally attached hereto as contract documents so far as they may be consistent with the drawings and specifications referred to in Article II above."

Contrary to its expectations contractor found, upon the arrival of the KVS equipment, that it consisted of many small, unassembled pieces. The assembling of the KVS equipment was then carried out by contractor under the supervision of an engineer of KVS employed by the owners.[2]

Contractor made no claim for the extra labor until March 6, 1965, more than nine months after the project had been completed. The bill submitted showed the total cost of "equipment setting and erection" to be $26,955.62. Credit for $17,500.00, the bid price, left a balance of $9,455.62, the amount allowed by the court.

Careful analysis of the record convinces us that the trial court fell into error in sustaining this charge. It is clearly evident that contractor, through its agent, Bill Fitts, chose to completely ignore the reference drawings which contained detailed specifications. Rather, it assumed solely on the basis of Mr. Shandry's statement that the KVS equipment would arrive largely assembled. Since the detailed specifications in the reference drawings could have been readily ascertained by referring to the drawings in the bid information, and became in fact a part of the December 24th contract, we cannot escape the conclusion that it was encumbent upon contractor to probe into the matter more than it did before submitting its bid.

In summary, the allowance in question, supported only by the uncorroborated testimony of Bill Fitts, is contrary to the bid information, the plans and specifications, the testimony of Terry Dunlap, an engineer, who detailed in great length the information available in the reference

2. Mr. Scott Kipping, the KVS engineer who supervised the assembling, testified, without contradiction, that KVS shipped the components of the equipment to the Marble City site in as large pieces as was permitted by railroad specifications; that similar KVS components were assembled and shipped to five other identical plants in the same manner.

drawings, and the testimony of the KVS engineer. We conclude that a mistake has been committed and that the court's allowance of this item must be reversed.

### III.

█ The contractor submitted an invoice to the owners in the amount of $1,271.12 for extra expense incurred in changing the design of a pan conveyor, known as "apron conveyor X."

This particular item was to be furnished by the contractor under the "materials handling contract" at a cost of $3,500.00. The original contract bid and specifications called only for an 18″ x 35′ apron conveyor without any indication as to its design. Contractor originally furnished a 35 foot long incline conveyor, which was later replaced by a conveyor which was both horizontal and incline, thereby necessitating the additional expense.

The dispute mainly concerns the reason for replacement of the conveyor. Terry Dunlap testified in substance that installation of the KVS equipment necessitated the use of a horizontal and incline conveyor from the start, and that contractor through its own faulty design merely failed to provide the proper equipment as it was required to do under the second contract. Dunlap stated further that a straight incline conveyor would not fit in with the KVS equipment without some modification of the KVS duct work, which in turn would have voided any warranty given with the KVS equipment. His testimony was substantially corroborated by Thomas E. Forster, Jr., a subcontractor who fabricated the conveyor for Warmack-Fitts, who testified equivocally that Frank Quinton, an engineer for Warmack-Fitts, told him the conveyor was improperly designed and would not fit.

On the other hand, Bill Fitts' for the contractor testified that the contract specifications contemplated an incline conveyor and that a combination horizontal and incline conveyor would have necessitated a completely different set of specifications from those given in the contract. He also stated unequivocally that Dunlap himself requested the change in the type of conveyor used. Frank Quinton further corroborated Fitts' testimony by stating that a 35 foot long incline conveyor would dovetail with the KVS equipment with only a minimal amount of rebracing required.

The court found on this conflicting testimony that the incline type of conveyor could have performed an adequate job in connection with the KVS equipment, and thus allowed the change in design as an extra expense chargeable to owner. In view of the conflicting testimony we are not prone to set aside the trial court's finding as clearly erroneous. Certainly, the record reveals substantial evidence in support of it.

### IV.

█ Contractor's invoice No. 3652 in the sum of $238.43 relates to sales taxes charged by the Forster Manufacturing Company to the contractor, Warmack-Fitts, for certain materials handling equipment fabricated by the Forster Company under the second contract. Contractor in turn passed this expense on to the owner pursuant to a contractual provision.[3]

Owners vigorously resisted imposition of this charge on the ground that had the contractor fabricated these various materials in its own shop, rather than subcontracted them out to the Forster Company, there would have been no sales tax charged. The trial court rejected this contention and treated this item as an allowable expense chargeable to the

---

3. The "materials handling contract" provided in pertinent part for the owners' assumption of various sales taxes:

"TERMS AND CONDITIONS OF SALE

\* \* \* \* \*

"2. All quotations and sales are subject to increase without notification by

the amount of any sales or excise tax levied or charged by any government agency \* \* \*."

owners. We agree. Considering the nature of the items involved, we feel that the contract clearly contemplated that contractor would have to purchase this equipment from various suppliers in order to fulfill the requirements of its contract. It seems wholly unrealistic in our view to expect a contractor engaged in structural steel work to fabricate each and every piece of equipment out of its own shop without the prerogative of subcontracting this work.

## V

■ Contractor's invoices Nos. 3654, 3656 and 3657 for $230.00, $100.00 and $310.00 represent extra charges due to changes in the length of two conveyors and in the height of an elevator. Contractor's invoice No. 3653 for $605.00 arises out of increasing the height of the penthouse from fourteen feet as specified in the contract to sixteen feet. All four of these items are related to each other. As was the situation in regard to other contested claims, there was conflicting evidence. Owners contended that the changes were due to the inadvertence and negligence of contractor in designing, whereas contractor asserted that the changes were made by owners after the written contract had been signed. The trial court was convinced that the charges resulted from a change in the plans and specifications. Our examination of the evidence convinces us that the trial court's findings are supported by substantial evidence and that these allowances are entitled to be affirmed.

## VI.

■ Owners' next contention relates to an allowance of $54.82 for the setting of the KVS control panel. Electrical work on the project had been awarded by owners to an electrical contractor wholly independent of the contracts awarded to Warmack-Fitts. Contractor charged the amount in question for use of its crane to pick up the electrical cubicle or control panel and place it in its proper location. The court found the charge was reasonable and that the contractor was not obligated by the written contract to move and place the panel. The evidence supports this finding and we affirm the allowance.

## VII.

■ Another item contested by owners relates to an extra charge of $90.00 for motor mounts used to support the tilting motor bases and shaker motors. Owners concede owing $174.00 as an extra expense for three tilting motor bases, but attempt to offset this amount by the cost of the motor mounts which they contend was covered by the "materials handling contract." The trial court rejected this set off, and held that the contract did not require contractor to furnish either the tilting bases or motor mounts.

We have fully canvassed the record pertinent to this item and find substantial evidence indicating (1) a definite need for the motor mounts and (2) neither the contracts nor specifications required contractor to furnish the motor mounts.

### CLAIMED CREDITS

### I.

■ Owners claimed an additional credit amounting to $57.50 for labor and materials in leveling off a site to enable contractor to lift by crane various sections of the KVS equipment onto the building site. Terry Dunlap, representing the owners, contended strenuously that this particular activity constituted part of the "erection work," for which contractor had the primary obligation under the first contract. While conceding responsibility for all excavation and backfill work under the contracts,[4] Dunlap nonetheless argued that leveling for the crane site constituted neither excavation nor backfill work. Contractor, on the other hand, contended, and the court so found, that owners had the responsibility

---

4. The "Data & Specification for Foundation Contractor," which constituted part of the first contract, provided in pertinent part that:

"Excavation—all necessary excavation and backfill work is to be performed by the owner."

for preparation of the site, including leveling, by virtue of a contractual clause which provided that contractor was to perform its work "* * * upon a site to be furnished by Owner."

In addition to conflicting testimony, we are faced with a contract which is at best inherently ambiguous as to this particular item. The contract seems equally susceptible to an interpretation of allowance or disallowance. All we can say on this record is that the trial court has made a permissible interpretation on the basis of the evidence before it. Certainly we cannot categorize its finding as clearly erroneous.

## II.

■■■■ There is a controversy as to whether contractor was required to paint the exterior and interior of eight storage bins or tanks with an oxide primer and one coat of enamel. Contractor concedes that it painted the interior of the tanks with only a primer coat and only partially painted the exterior with a primer coat. Owners' position is that it is entitled to an additional credit of $4,000.00 because the contractor defaulted in regard to this phase of the construction. The trial court declined to allow the credit, apparently on the theory that the disagreement with respect to painting, which arose subsequent to the execution of the written contract, had been compromised by the parties. Our examination of the relevant evidence convinces us that the court's finding and its disallowance of the extra credit is clearly erroneous and must be reversed.

Contractor asserts that the invitation for bids on the eight tanks called only for a "shop coat of red oxide primer," and that its bid was responsive to that information. Owners dispute this and argue that the document upon which the contractor relied was merely an invitation to bid only on the *fabrication* of the eight storage bins whereas the "Owners' Specification for Fabrication and *Construction*" constituted the actual contract entered into on December 24th. Regardless of the purport of the first document, the conceded fact is that the contract—

the controlling document—expressly provided:

"After complete fabrication, each unit will be cleaned both inside and out, and will be painted inside and out only one shop coat of green oxide primer and one coat enamel, our [owners'] choice."

As we have heretofore pointed out, the December 24th contract unequivocally provided that the specifications controlled where a conflict occurred between the proposal and bid on the one hand and the specifications on the other.

Accepting contractor's interpretation of the bid proposal document, it is self-evident that there was a conflict between that document and the contract specifications which, without more, would compel a decision in favor of the owners. The question remains as to whether the parties modified or amended the written specifications by a subsequent oral agreement. On this issue Bill Fitts, representing contractor, and Terry Dunlap, representing the owners, were the key witnesses. Fitts testified that he did not read the portion of the December 24th contract relating to the painting of the tanks until December 26th, two days after he signed it. He further stated, in substance, that after he discovered the discrepancy between the bid proposal and the contract specifications, he and Terry Dunlap mutually agreed that contractor would be relieved from its contractual obligations and that one coat of primer paint on the exterior and interior of the tanks would suffice. Dunlap denied this and stated, in effect, that there had been no deviation from or modification of the written contract. Dunlap's version of the matter has appealing logic. It is difficult for us to comprehend that Dnnlap would agree to cancel out a $4,000.00 item and receive nothing in return.

In summary, we do not believe contractor should be relieved from its written obligations because of the negligence of its president in failing to read the contract before signing it. Written and binding contracts should not be cast aside on the uncorroborated and contradicted testimony of an interested party. We

conclude that more proof was required than appears in this record before a court is justified in holding that the contract specifications do not control. The evidence shows that the fair and reasonable value of the painting was $4,000.00. Owners are entitled to credit for that amount.

## COUNTERCLAIM

Owners' cause of action against contractor was premised on damages allegedly suffered as the result of the failure of contractor to complete the construction on or before April 22, 1964. Alternatively, owners alleged that in the event the court should find that the April 22nd completion date did not apply to contracts one and two, the court should find nevertheless that contractor failed to complete the construction with reasonable dispatch. As stated at the outset, owners sought judgment on their counterclaim for $55,000.00. The trial court found in favor of contractor and dismissed the counterclaim. We affirm.

The first contract did not contain a completion date. It did provide, however, that:

"Notwithstanding that no completion date is set, it is understood that time is of the essence. * * * Contractor * * * shall commence work under this contract no later than January 15, 1964, unless prevented therefrom by fault on the part of the owner or engineer * * *, and upon commencement shall proceed continuously and with reasonable dispatch to completion."

The second contract contained no completion date. The third contract (March 17, 1964) provided "Contractor agrees to complete this contract on or before April 22, 1964." It also contained a provision for liquidated damages for delays at the rate of $500.00 per working day.

Owners take the position that the three contracts should be considered as one and that the completion date of April 22nd and the liquidated damages provision should apply to the entire project. Judge Miller pretermitted discussion of this phase of the matter for the reason that owners had failed to establish that contractor was responsible for any delays in the completion. Owners argue that the record is replete with overwhelming evidence that contractor performed this job from start to finish in a manner that was "plagued with incompetence, negligence, and inefficiency" which caused the delay in the completion. Judge Miller was not so convinced. His memorandum opinion deals at some length with the evidence. The gist of his findings are:

"The evidence establishes, and the court is convinced, that the plaintiff performed its contract and completed the construction in a workmanlike manner and within a reasonable time under the circumstances then existing. The majority of the delay, of which the defendant complains and seeks to penalize the plaintiff, was occasioned by Hewitt-Robbins' and KVS's failure to ship essential elements of the kiln system. The last items shipped were those purchased from KVS by the defendants, and the work could not be completed until the arrival of the KVS cooler. Without doubt, the job was completed within a reasonable time after the arrival of the cooler and kiln gear and pinion."

We refrain from burdening this already lengthy opinion with a discussion of the evidence relating to the delay issue. The cause of the delay, if any, was the key question. We are satisfied that the court's resolution of that controversy in favor of contractor finds ample support in the record and is not clearly erroneous.

## INTEREST

Owners also challenge the propriety of the trial court's allowance of interest on the entire judgment of $45,303.21 from June 26, 1964, the date of completion of the plant. They argue that the various extras claimed by contractor in addition to the contract price constituted an unliquidated demand, on which no interest should have been allowed prior to judgment, or alternatively, prior to contractor's demand for payment of the extras.

The litigants by stipulation have agreed that the balance on the contract due contractor, adjusted by undisputed credits, amounted to $23,286.78. From the sum of the foregoing there shall be deducted $4,000.00, the amount due owners for painting omitted by contractor, and $1,710.00 for additional concrete required in the foundation work, which the district court credited to owners. Contractor is entitled to interest at 6% on the balance thereof from the date of completion, June 26, 1964. As to the mutually approved extras, however, as well as to those disputed items whose allowance has been found to be proper, owners should not be charged with interest prior to the time contractor has made its demand. Norton v. Hickingbottom, 212 Ark. 581, 206 S.W. 777 (1947); White & Black Rivers Bridge Co. v. Vaughan, 183 Ark. 450, 36 S.W.2d 672 (1931). Since contractor made no demand for payment of either the conceded or disputed extras prior to submission of its invoices, interest should be computed from the dates of these respective invoices.

To recapitulate the effect of our holding contractor is entitled to recover from owners:

| | | |
|---|---:|---:|
| Agreed Balance Due on Contract Prior to Any Adjustments | $30,599.60 | |
| Less Mutually Approved Credit Memos | 7,312.82 | |
| Less Credit for Unfinished Painting, Allowed on Appeal | 4,000.00 | |
| Less Additional Credit Allowed by District Court on Credit-Memo 3645, not in Issue on Appeal | 1,710.00 | |
| Sub-Total | $17,576.78* | $17,576.78 |
| Plus Uncontested Extras Per Item IV of Stipulation | $ 493.22 | |
| Plus Mutually Approved Portion of Extras Per Item V of Stipulation, as Amended at Trial | 3,544.00 | |
| Plus Additional Contested Portion of Extras Per Item V of Amended Stipulation, as Allowed by District Court and Affirmed on Appeal | 4,381.95 | |
| Plus Additional Contested Extras Per Item VI of Stipulation, Less $9,455.62 under Invoice I, Disallowed on Appeal | 5,851.64 | |
| Sub-Total | $14,270.81** | $14,270.81 |
| Total judgment due contractor, exclusive of interest which shall be computed as indicated herein | | $31,847.59 |

*Contractor is entitled to interest on this amount from the date of completion, June 26, 1964.

** Contractor is entitled to interest on this amount from the dates of contractor's respective invoices.

The judgment appealed from in case No. 18,437 is vacated and the cause is remanded with direction to enter another judgment in favor of contractor for the amount due in accordance with the dictates of this opinion.

### APPEAL NO. 18,438.

 Contractor appeals from that portion of the judgment disallowing its claim for attorney fees under Okla.Stat. Ann. tit. 12, § 936 (Supp.1961).[5]

Contractor argues that the series of transactions involving extra charges and credits · constituted an "open account" within the meaning of the statutory language. Resolution of this question in favor of the contractor would require an initial determination that the contracts are governed by Oklahoma law as opposed to Arkansas law, a point upon which the parties disagree. Implicit in contractor's argument for application of Oklahoma law to this facet of the litigation is the absence of any law in Arkansas, statutory or decisional, authorizing the taxing of attorney fees in a case of this type in favor of the prevailing party. We need not resolve the conflicts question in view of our considered opinion that the Oklahoma Statute, even if applicable, would not encompass the type of situation we have before us. There is no evidence in the record that the parties pursued a course of action whereby they regarded the items in issue as constituting an account, which would be subject to a shifting balance as additional debit or credit entries were made. In short, we find the record totally devoid of any evidence that the parties ever contemplated a debtor-creditor relationship with the expectation of a continuing series or course of dealings between them. See Whitson v. Wetherbee Electric Company, 416 P.2d 888 (Okla.1966); Sanditen v. Brooks Flame-Spray, Inc., 403 P.2d 471 (Okla. 1965). We conclude therefore that under Oklahoma law there would be no legal basis for taxing contractor's attorney fees as part of the litigation costs. The judgment disallowing attorney fees is affirmed.

The clerk is directed to tax the cost of the record in both appeals as follows: eighty per cent. (80%) thereof against Homer Dunlap, etc. and twenty per cent. (20%) against Warmack-Fitts Steel Company, Inc.

---

5. Section 936 provides as follows:
"In any civil action to recover on an *open account* the prevailing party shall be allowed a reasonable attorney fee to be set by the court, to be taxed and collected as costs." (Emphasis added).